**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANTHONY ANDREWS,       )
                                 )
            Plaintiff,      )
                                 )
          v.           )    Civil Action No. 12-626
                                 )    Judge Nora Barry Fischer
MICHAEL J. ASTRUE,     )
                                 )
           Defendant.    )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Anthony Andrews ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 404-434 ("Act"). The record has been developed at the administrative level, and the parties have brought cross-motions for summary judgment. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment (Docket No. 8) is DENIED, and Defendant's Motion for Summary Judgment (Docket No. 10) is GRANTED.

## II.    PROCEDURAL HISTORY

Plaintiff applied for DIB on June 18, 2009, alleging both physical and mental impairments with a disability onset date of August 10, 2007. (R. at 122-23, 154-55).[1] Following

---

[1] Citations to ECF Nos., the Record, *hereinafter*, "R. at ___."

the initial denial of his application on January 11, 2010 (R. at 72-76), a hearing was held before an ALJ on February 24, 2010 at which Plaintiff and a vocational expert appeared and testified (R. at 28-69). The ALJ issued his unfavorable decision to Plaintiff on April 27, 2011. (R. at 12-23). Plaintiff filed a request for review by the Appeals Council, which was denied on March 12, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1-4). Having exhausted all administrative remedies, Plaintiff filed his Complaint in this Court on May 11, 2012. (Docket No. 4). On July 16, 2012, Defendant filed his Answer. (Docket No. 5). Subsequently, Plaintiff filed his Motion for Summary Judgment with Brief in Support on August 13, 2012. (Docket Nos. 8-9). Defendant filed his cross-motion and supporting brief on September 4, 2012. (Docket Nos. 10, 12).

## III.  FACTS

### A. General Background

Plaintiff was born on August 17, 1967 and was forty-three years of age at the time of his hearing. (R. at 122). He lived in Cardele, Pennsylvania with his wife, his six-year-old son, and a stepson who is sixteen years old. (R. at 30, 46, 144). Plaintiff is a high school graduate and completed two years of computer training at a community college in 1989. (R. at 152, 552). His past relevant work history consists mostly of clerical and customer service jobs. (R. at 157, 160-61). Plaintiff reported that he stopped working at his last job as a material handler for Dick's Sporting Goods because he was injured on the job. (R. at 145).

Though Plaintiff previously had a driver's license, he did not drive at the time of his hearing because he had failed to renew it. (R. at 168). His daily activities mostly consisted of watching television, using the Internet on his home computer, and cooking dinner each night, which took him approximately one to two hours. (R. at 165-67). He reported that he was the

primary caregiver of his young son, who was four years old at the time Plaintiff filed for DIB. (R. at 165). Besides completing domestic activities, sometimes Plaintiff spent his day with his family at the mall or Walmart "walk[ing] around for awhile." (*Id.*). In his self-report, Plaintiff claimed that he could sit for, at most, 30 minutes and was able to walk up to one mile before needing to rest for 15 minutes; however, he stated that he did not require an ambulatory device. (R. at 170-71).

### B. Medical History

In his Disability Report, Plaintiff claimed that a back injury, diabetes, and depression limit his ability to work.[2] (R. at 145). His list of medications relevant to his back condition consisted of amitriptyline,[3] "HCD,"[4] Neurontin,[5] and Tizanidine[6] at the time of his hearing. (R. at 151, 185). He reported that he was helped by medication, which typically takes about 30 minutes to take effect and lasts all day. (R at 173-74). He does not engage in alcohol or tobacco use. (R. at 319).

---

[2]     In his Motion for Summary Judgment, Plaintiff challenges findings related to his back injury, but raises no objections to the ALJ's conclusions regarding the impact of his depression or diabetes on his ability to work. (Docket Nos. 8-9). As to these conditions, Plaintiff testified that his diabetes was "under control," and that his occasional feelings of depression, for which he did not take medication, were related to being unemployed. (R. at 47-49). Thus, discussion will be limited to the facts pertaining to Plaintiff's back condition.

[3]     Amitriptyline is a type of tricyclic antidepressant that "works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance." PubMed Health, Amitriptyline, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666/ (last visited October 9, 2012). It also may be prescribed for other uses, such as "post-herpetic neuralgia (the burning, stabbing pains, or aches that may last months or years after a shingles infection)." *Id*.

[4]     HCD is an abbreviation for a type of hydrocodone, which is "available only in combination with other ingredients," some of which "are used to relieve moderate to severe pain." PubMed Health, Hydrocodone, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014/ (last visited October 9, 2012). Hydrocodone "is in a class of medications called opiate (narcotic) analgesics and in a class of medications called antitussives." *Id*. It "relieves pain by changing the way the brain and nervous system respond to pain," and is taken "in combination with at least one other medication." *Id*.

[5]     Neurontin is the brand name for gabapentin, an oral medication typically "used to help control certain types of seizures in people who have epilepsy." PubMed Health, Gabapentin, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited October 9, 2012). Gabapentin "is also sometimes used to relieve the pain of diabetic neuropathy (numbness or tingling due to nerve damages in people who have diabetes)." *Id*.

[6]     Tizanidine is "in a class of medications called skeletal muscle relaxants" which works "by slowing action in the brain and nervous system to allow the muscles to relax." PubMed Health, Tizanidine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000106/ (last visited October 9, 2012).

### 1. *Plaintiff's Back Injury – June 2006*

Plaintiff sustained a work-related back injury on June 13, 2006 after he lifted a heavy box while working as a material handler at the distribution center of Dick's Sporting Goods. (R. at 42, 194). The next day, Plaintiff sought treatment at Uniontown Hospital, where he was diagnosed with a soft tissue injury. (R. at 194). Following a referral by his primary care physician, Dr. Andrew Stroh, an MRI of Plaintiff's lumbar spine was taken at Frick Hospital on August 14, 2006, which revealed small central disc bulges at L4-L5 and L5-S1. (R. at 186, 242-43). Dr. Stroh treated Plaintiff with Flexeril[7] and Celebrex,[8] and prescribed physical therapy. (R. at 194).

### 2. *Evaluations by Dr. Rich Kozakiewicz, M.D. – October 2006, April 2007*

Subsequently, Plaintiff filed a claim for workers' compensation benefits, which was evaluated on October 9, 2006 by a specialist in physical medicine and rehabilitation, Dr. Rich Kozakiewicz, M.D. of Pennsylvania Physical Medicine, Inc., located in Greensburg, PA. (R. at 194). Dr. Kozakiewicz reviewed the images of Plaintiff's MRI and reported that they showed "mild degenerative changes most notable at L5-S1." (*Id*.). His impression was that Plaintiff suffered "minimal residuals of work-related lumbosacral sprain/strain"; however, Dr. Kozakiewicz maintained that Plaintiff was capable of full-time, full-duty employment. (R. at 195). Recommending a brief course of chiropractic care and a daily home program, Dr.

---

[7] Flexeril is commonly known as cyclobenzaprine, which is "a muscle relaxant… used with rest, physical therapy, and other measures to relax muscles and relive pain caused by strains, sprains, and other muscle injuries." PubMedHealth, Cyclobenzaprine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHo000699/ (last visited October 9, 2012).

[8] Celebrex is a brand name for celecoxib, which "is in a class of NSAIDs called COX-2 inhibitors" and "works by stopping the body's production of a substance that causes pain and inflammation." PubMed Health, Celecoxib, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001050/ (last visited October 9, 2012). It is typically used to treat types of arthritis, but may also be used "to relieve other types of short term pain including pain caused by injuries, surgery and other medical or dental procedures, or medical conditions that last for a limited time." *Id*.

Kozakiewicz referred Plaintiff to Midtown Chiropractic for treatment by Dr. Craig Weimer, D.C. (*Id.*).

On October 16, 2006, Plaintiff appeared for his first session with Dr. Weimer. (R. at 222-24). He reported experiencing constant pain at an intensity level of five (5) on a pain scale of one (1) to ten (10). (R. at 222). Dr. Weimer diagnosed Plaintiff with sacrolitis, post sprain strain, and low back pain. (R. at 224). Throughout his physical therapy appointments that October, Plaintiff took Flexeril and Tramadol[9] in addition to anti-inflammatories, and his conditions improved with chiropractic treatment: on October 27, 2006, Plaintiff reported that his pain had decreased to a level of three (3) to four (4) out of ten (10) on the pain scale, and at his next appointment with Dr. Weimer on October 30, 2006, Plaintiff reported that he was "feeling a lot better." (*Id.*).

Plaintiff followed up with Dr. Kozakiewicz on October 30, 2006, who opined that Plaintiff had "definitely" benefitted from chiropractic treatment and the home exercise routine. (R. at 192). Dr. Kozakiewicz reported that Plaintiff experienced only minimal stiffness in the right lumber area; his impression was that the minimal residuals of Plaintiff's work-related injury were "largely resolved" and that "full time full work duties continue to be medically appropriate." (*Id.*).

On November 6, 2006, Dr. Weimer noted "continued improvement" in Plaintiff's condition. (R. at 224). Despite Plaintiff's reports of some increase in his back pain throughout his other appointments in November, Dr. Weimer attributed his pain to "mild overuse exacerbation" and did not adjust the current treatment protocol. (R. at 225). On December 4, 2006, Dr. Weimer diagnosed Plaintiff with subluxation and mechanical back pain. (R. at 225-226). Again, on December 8, 2006, Plaintiff reported some increase in his back pain associated with lifting and

---

[9]    Tramadol is an "opiate agonist" used "to relieve moderate to moderately severe pain," which "works by changing the way the body senses pain." PubMed Health, Tramadol, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960/ (last visited October 9, 2012).

stocking tasks at work, but Dr. Weimer noted that his pain had been reduced "quite a bit" through treatment. (R. at 226). On January 3, 2007, Plaintiff informed Dr. Weimer that he had been using a molded back brace at work and found it to be very helpful, commenting that he had very little pain at work. (*Id*.). Dr. Weimer noted that Plaintiff's pain had improved and that his range of motion was within normal limits. (*Id*.). Moreover, on January 8, 2007, Dr. Weimer reported that Plaintiff's complaints were "improved in comparison to the last visit" and "mild." (*Id*.). At subsequent appointments in January and February 2007, Dr. Weimer remarked that Plaintiff's condition had improved, and Plaintiff rated his pain as a two (2) or three (3) out of ten (10). (R. at 227). At appointments later in February and into April 2007, Plaintiff claimed to suffer from increased back pain, but Dr. Weimer attributed these complaints to lifting tasks at work. (R. at 227-28).

When Plaintiff returned to see Dr. Kozakiewicz on April 9, 2007 due to "ongoing low back pain during work activities," Dr. Kozakiewicz nonetheless reported that Plaintiff's physical examination that day looked "quite good." (R. at 191). According to Dr. Kozakiewicz, no new injury had occurred; he opined that "[f]ull time full work duties remain medically appropriate," and he explicitly stated that he did not recommend further chiropractic care. (*Id.*).

### 3. *Examinations by Dr. Rajesh C. Shah, M.D. – June, August, September 2007*

On June 11, 2007, Dr. Rajesh C. Shah, M.D., a specialist in internal medicine, performed a physical examination of Plaintiff at his Brownsville, PA office. (R. at 319). At this time, Plaintiff reported that he wore a back brace at work for support and that he treated his back pain with over-the-counter medication. (*Id*.). Upon examination, Dr. Shah ordered blood work after noting tenderness over Plaintiff's lumbosacral spine and told Plaintiff to follow up in one month. (R. at 320).

On July 30, 2007, Plaintiff was admitted to the emergency room at Uniontown Hospital because he could not open his eye, which was red and swollen. (R. at 363). Dr. Bruce E. Teich, M.D. examined Plaintiff and diagnosed him with conjunctivitis with a corneal abrasion. (R. at 363-64). Dr. Teich excused Plaintiff from work for two days and referred him to an ophthalmologist named Dr. Sobol, who prescribed Plaintiff eye drops and a patch for his eye. (R. at 323, 363-64).

According to Plaintiff, after returning to work following his eye infection, he reinjured his back while lifting a box and was subsequently absent for four weeks. (R. at 414-15). Thereafter, Plaintiff followed up with Dr. Shah on August 13, 2007, complaining that his back pain had increased over the past three weeks, causing him to have trouble tying his shoes and to awaken frequently in the night with pain radiating into his legs. (R. at 323). Plaintiff reported that he had been assigned light duty tasks at work, but still was required to lift heavy weights at times. (*Id.*). Dr. Shah diagnosed Plaintiff with acute worsening of chronic low back pain and prescribed him Medrol,[10] Darvocet, and Neurontin. (R. at 324). Dr. Shah provided a written excuse to Plaintiff's employer indicating that Plaintiff was "to stay on light duty and not lift anything for the next three weeks." (*Id.*).

When Plaintiff followed up with Dr. Shah on August 20, 2007, he reported that his back pain had improved since starting Neurontin, though he described it as a seven (7) out of ten (10) on the pain scale. (R. at 321). Thereafter, Dr. Shah referred Plaintiff to physical therapy at Redstone Rehabilitation Services in Uniontown, PA. (R. at 217-19).

---

[10]     Medrol is the brand name for methylprednisolone, a corticosteroid, which "is similar to a natural hormone produced by [the] adrenal glands" and "relieves inflammation (swelling, heat, redness, and pain) and is used to treat certain forms of arthritis…" PubMed Health, Methylprednisolone oral, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000776/ (last visited October 9, 2012).

Plaintiff was initially evaluated by Catherine Petrucci, a physical therapist, on August 22, 2007, at which time his movements were guarded. (R. at 218-19). Ms. Petrucci set a goal of six weeks for Plaintiff to return to full-duty work and for his pain to be, at most, a three (3) out of ten (10) on the pain scale. (*Id*.) On August 27, 2007, Plaintiff told Ms. Petrucci that he was having trouble completing his home exercises, but she observed that he could "move more easily" following treatment that day. (R. at 215). She recommended modifications to Plaintiff's lifting technique in order "to help him return to work"; however, she commented that Plaintiff's material handler position required particular duties, such as moving boxes of "varying weight and shapes" within "space constraints," that could make it difficult for him to return to "this job." (*Id*.).

When Plaintiff returned for physical therapy on August 29, 2007, he told Ms. Petrucci that his back pain had slightly decreased and that he did not have any pain radiating down his legs. (R. at 214). However, at his appointment the very next day, Plaintiff claimed that his pain had increased so much that sitting for 30 minutes was difficult. (R. at 213). On September 12, 2007, Plaintiff reported a "significant increase" in his lower back pain for which he could find no relief, but he said that his pain "varies day to day." (R. at 208). Ms. Petrucci observed that Plaintiff's movements were "stiff and guarded" and that he showed a "slow cadence for ambulation," but his mobility appeared to have nevertheless improved. (*Id*.).

Plaintiff followed up with Dr. Shah on September 17, 2007, who noted: "Sometimes [Plaintiff] feels good and sometimes he does not feel good." (R. at 325). Dr. Shah recommended that Plaintiff undergo another MRI, since his last one had been conducted over a year ago. (*Id*.). Dr. Shah then wrote a note to Plaintiff's employer limiting him to light duty work until he could be examined by a back surgeon. (R. at 326).

### 4. *Evaluation by Dr. Kozakiewicz – October 2007*

On October 3, 2007, Dr. Kozakiewicz performed another independent medical examination of Plaintiff, noting that he had evaluated and treated Plaintiff "on multiple occasions." (R. at 187). Dr. Kozakiewicz referenced his April 9, 2007 examination of Plaintiff, at which time he found that Plaintiff was "anatomically intact" and the "only 'finding' on physical exam was non-anatomical tenderness to the barest of light touch." (R. at 187). Further, he added that he gave Plaintiff "the benefit of the doubt" at the April examination by "not frankly stat[ing] that [Plaintiff] was fully recovered at that juncture." (R. at 187-88). Although Dr. Shah had been excusing Plaintiff from work, Dr. Kozakiewicz reported that there was "no objective medical basis for the disability that has been in place since [August 2007]." (R. at 188-89).

Dr. Kozakiewicz determined that "[Plaintiff] has fully recovered from his lumbosacral sprain/strain," and gave the following reasons to support his assessment: (1) Plaintiff had no anatomically-based neuromusculoskeletal deficits; (2) Plaintiff's physical examination records were inconsistent and "none [were] supportive of any medical pathology"; (3) Plaintiff's MRI results were normal; (4) Plaintiff's clinical presentation was "not at all consistent with any lumbosacral nerve root dysfunction"; and (5) Plaintiff's subjective complaints had increased since his last evaluations, to which Dr. Kozakiewicz commented that "[t]his alone makes no medical sense." (R. at 188-89). Therefore, Dr. Kozakiewicz found that there was "no medical basis" for Plaintiff's adoption of a "disabled lifestyle," and that "[w]ith no work-related impairment present, there is in turn no basis for any work-related disability." (R. at 189). Thus, he concluded that Plaintiff was "objectively medically capable of full time gainful employment without restrictions no later than [October 3, 2007]," and he signed an affidavit of recovery, releasing Plaintiff back to work. (R. at 190, 235-36).

**5. *Initial Examinations by Dr. Alan J. Cappellini, D.C. and Dr. John K-S Lee, M.D.***

Subsequently, Plaintiff came under the care of Dr. Alan J. Cappellini, D.C., whom his wife "knew about," based on an apparent referral by Dr. Shah. (R. at 245). Plaintiff's first appointment with Dr. Cappellini was on November 1, 2007 at the Grandview Medical Center in Uniontown, PA, at which time he described injuring his back at work in June 2006 and again in August 2007, reporting moderate to severe low back pain that radiated into his legs. (R. at 206). That day, x-rays and an MRI were taken of Plaintiff's back at Uniontown Hospital, revealing degenerative disc disease at the L5-S1 level. (R. at 196, 305-307, 373, 573).

Thereafter, Dr. Cappellini provided Plaintiff with a note to "remain off of work," which read: "Due to a work related injury, [Plaintiff] is disabled from gainful employment. He is to refrain from work and remain at reduced activity pending further notice." (R. at 207, 233). Dr. Cappellini reiterated that Plaintiff was to remain at reduced activity on November 8, 2007. (R. at 204). On November 15, 2007, in response to a questionnaire required by Plaintiff's employer in conjunction with his workers' compensation claim, Dr. Cappellini reported that Plaintiff was "totally incapacitated at this time" and that it was "undetermined" when he could return to work. (R. at 230).

Subsequently, Dr. Cappellini referred Plaintiff to Dr. John K-S Lee, M.D., a Board Certified Physiatrist, at Jefferson Pain and Rehabilitation Center. (R. at 203, 414-18). In his written correspondence to Dr. Lee preceding Plaintiff's visit, Dr. Cappellini opined that Plaintiff had been "shuffled through the panel providers," who Dr. Cappellini believed had "failed to accurately diagnose, direct, and coordinate treatment" of Plaintiff's condition. (R. at 229). Dr. Cappellini diagnosed Plaintiff with "substantial loss of disc space," "positive root irritation signs on clinical exam," and "a pain avoidance behavior." (*Id*.). Dr. Cappellini asserted that Plaintiff's

back pain stemmed from his injury at work and rendered him "disabled from his time of injury occupational duties." (*Id.*).

Plaintiff saw Dr. Lee for the first time on November 20, 2007, presenting with a "moderate degree of muscle spasms along his mid and low back" and walking "slowly with back guarding." (R. at 416). Dr. Lee diagnosed Plaintiff with a lumbar sprain, sciatica,[11] sacroiliitis, a bulging disc and annular tear, and "flare ups" of pre-existing asymptomatic degenerative disc disease at the L5-S1 level resulting from the work-related injury. (R. at 417). Dr. Lee administered nerve block injections to Plaintiff before recommending a "functional capacity evaluation" and "spinal function sort test" in order "to evaluate [Plaintiff's] residual functional motor limitation." (*Id.*). Dr. Lee prescribed Plaintiff Amitriptyline, Sertraline (Zoloft), Tizanidine, and Gabapentin (substitute for Neurontin). (R. at 202).

On November 29, 2007, Plaintiff underwent a discogram at Mon Valley Hospital, which revealed minimal narrowing of L5-S1 disc space and endplate sclerosis, but no obvious disc herniation. (R. at 352, 427). Plaintiff saw Dr. Cappellini the next day, presenting with pain, point tenderness, swelling, and incomplete ranges of motion with spasm. (R. at 202). Thereafter, Dr. Lee performed a nerve conduction test of Plaintiff's bilateral lower extremities, which he found to be suggestive of chronic bilateral L5-S1 lumbosacral nerve root irritation without active denervation pattern in the leg muscles "yet." (R. at 426). At appointments with Dr. Cappellini in December 2007, Plaintiff was "given a patch for pain" and instructed to "remain at reduced activity." (R. at 200).

Plaintiff saw Dr. Cappellini on January 3, 2008, reporting increased low back pain and swelling that had lasted for three days and was exacerbated by sitting and bending. (R. at 291).

---

[11]    Sciatica "refers to pain, weakness, numbness, or tingling in the leg... caused by injury to or pressure on the sciatic nerve." PubMed Health, Sciatica, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001706/ (last visited October 9, 2012). "Sciatica is a symptom of another medical problem, not a medical condition." *Id.*

At this visit, Dr. Cappellini noted that Plaintiff was scheduled for a workers' compensation hearing on January 29, 2008. (*Id.*). In contrast to Plaintiff's appointment with Dr. Cappellini on January 3, when Plaintiff was examined by Dr. Lee on January 15, 2008, he did not report any new complaints and remarked that treatment was helping him "to be more active." (R. at 413).

On January 22, 2008, Dr. Cappellini wrote a medical source statement in anticipation of Plaintiff's workers' compensation hearing, describing his approach as "multidisciplinary" and opining that Plaintiff would require such ongoing care "for an indefinite period into the future." (R. at 285). Dr. Cappellini explicitly stated that Plaintiff was "disabled from his time of injury occupational duties" and that, in his professional opinion, his treatment of Plaintiff was "reasonable, necessary, and related to the work occurrence." (*Id.*).

### 6. *Evaluation by Dr. Terry Trout, M.D. – January 2008*

Plaintiff's appeal for short-term workers' compensation benefits was denied after the reviewing physicians determined that he was not disabled, in contrast to the opinions of Dr. Cappellini and Dr. Lee. (R. at 298-301). First, the physicians concluded that Dr. Kozakiewiz's findings were "significantly different" from Dr. Cappellini's. (R. at 299). Additionally, the records did not support a finding that Plaintiff was unable to perform the full functions of his job. (*Id.*).

In order "to provide a full and fair appeal review," Plaintiff's employer referred his claim for review by Dr. Terry Trout, M.D., a Board Certified Physical Medicine and Rehabilitation specialist. (*Id.*). Conclusively, Dr. Trout opined that Plaintiff's back impairment was "not supported" and that his medical records were "highly inconsistent." (*Id.*). Specifically, the diagnostic findings did not correlate with Dr. Cappellini's report that Plaintiff suffered from "highly limited lumbar spine motion" on November 1, 2007. (*Id.*). Upon review of the objective

medical evidence, Dr. Trout determined that Plaintiff's MRI, x-ray, and radiography results were "mild." (R. at 300). He further noted that he had "made multiple attempts" to speak with Dr. Cappellini and Dr. Shah, but was denied. (*Id*.). In conclusion, Dr. Trout wrote that "[d]ue to the fact there is no supportive evidence of impairment, there is no reason to continue with any form of restrictions." (R. at 299).

### 7. *Treatment by Dr. Cappellini – January-March 2008*

On January 29, 2008, Dr. Cappellini noted that Plaintiff's disability status was "present and continuing," and on February 7, 2008, he authored a note to Plaintiff's employer limiting Plaintiff to "a maximum level of light duty." (R. at 283, 297). In his treatment notes from February 7, Dr. Cappellini wrote that Plaintiff's disability status was "present [and] continuing," that he had "[l]ow risk functional capabilities," and that he was limited to part-time work that was "sedentary to light duty." (R. at 282). One week later, on February 14, 2008, Dr. Cappellini wrote that Plaintiff's disability status was "total and continuing." (R. at 281). Similarly, on March 12, 2008, Dr. Cappellini wrote that Plaintiff was "disabled from gainful employment at this time, without restriction," and was "to remain at reduced activity and return in one to two weeks as needed." (R. at 278).

However, on March 27, 2008, Dr. Cappellini wrote that Plaintiff was "feeling better [and] mild[ly] improved," although his disability status was still "present and continuing"; Dr. Cappellini recommended that Plaintiff's activity restrictions be "maintained indefinitely." (R. at 276). Yet, on April 8, 2008, Dr. Cappellini inserted an addendum to his notes from March 27, 2008, writing: "CORRECTION TO CHIEF COMPLAINT: The patient reports intermittent increased back pain and spasm. He reports carrying out self reliance home care measures with some degree of success." (*Id*.).

### 8. *Evaluation by Dr. Thomas Kramer, M.D. – March 2008*

On March 31, 2008, Dr. Thomas Kramer, M.D. performed an independent medical evaluation of Plaintiff in his Pittsburgh office. (R. at 244). Plaintiff reported that his injuries at work were the source of his low back pain, which he rated that day as a seven (7) to eight (8) out of ten (10). (R. at 246). Upon examination, Dr. Kramer found that "there was absolutely no evidence of swelling or spasm," but that Plaintiff exhibited a "significant withdrawal reflex" when mild palpitation was applied to his lower back, which Dr. Kramer opined was "somewhat of an exaggerated pain response." (R. at 247).

When Dr. Kramer observed Plaintiff's gait pattern, he found it to be "very unusual"; Plaintiff "walked very slowly" and had "very much difficulty" balancing when asked to walk heel to toe. (*Id.*). However, Dr. Kramer reported that this "would obviously represent an inconsistency," given that Plaintiff had normal strength "involving his anterior tibialis[12] and gastroc soleus[13] upon manual motor testing separately." (*Id.*). Moreover, Dr. Kramer observed Plaintiff from his fifth floor office window following the examination, at which time Plaintiff demonstrated a "markedly different gait pattern, which was essentially normal." (*Id.*).

After reviewing Plaintiff's medical records, Dr. Kramer noted that Dr. Stroh's notes from June to September 2006 "document[ed] the absence of radicular signs and symptoms" and that Dr. Kozakiewicz "felt there was no evidence of any objective abnormalities seen on physical examination." (R. at 248-49). Dr. Kramer concluded that Plaintiff had fully recovered from his work-related injuries and that there was "clearly no objective evidence" to substantiate Plaintiff's

---

[12]     In human anatomy, "anterior" refers to "the front surface of the body; often used to indicate the position of one structure relative to another." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006). "Tibialis" is a medical term relating to the tibia, which is "the large shinbone." *Id.*

[13]     "Soleus" is defined as a muscle "of [the] superficial posterior (plantar flexor) compartment of the leg" that is involved in "plantar flexion of [the] foot." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006). Its nerve supply is generated from the tibial region. *Id.* "Gastroc" may be an abbreviation for "gastrocnemius," the "superficial m[uscle] of posterior (plantar flexor) compartment of [the] leg." *Id.*

ongoing complaints of pain, including evidence of "ongoing spasm or swelling." (R. at 249). Further, Dr. Kramer pointed out that Plaintiff had not been on medication that day because his prescriptions had run out. (R. at 246, 249-50).

In Dr. Kramer's opinion, Plaintiff's medical records and his examination that day pointed to a diagnosis of degenerative disc disease, which Dr. Kramer believed was age-related and had "in no way been materially aggravated or worsened" by Plaintiff's work-related injuries. (R. at 250). Conclusively, Dr. Kramer determined that there were "no objective abnormalities to indicate ongoing disability" and that Plaintiff had demonstrated "exaggerated symptoms" and an "obvious inconsistency in gait." (*Id*.). Dr. Kramer signed an affidavit of recovery, releasing Plaintiff back to his job as a material handler with "no work restrictions." (R. at 250-51).

### 9. Treatment by Dr. Cappellini and Dr. Lee – April 2008-2009

On April 1, 2008, Plaintiff saw Dr. Cappellini, reporting "increased discomfort" after "going through" his exam with Dr. Kramer the day before. (R. at 275). At his appointments with Dr. Cappellini on April 8, April 17, May 1, and May 20, 2008, Plaintiff complained of increased pain and soreness. (R. at 271-74). Treatment notes from May 20, 2008 also indicate that Plaintiff furnished a copy of Dr. Kramer's report to Dr. Cappellini, who did not comment on its contents. (R. at 271-73).

While on June 3, 2008, Dr. Cappellini reported that Plaintiff's condition was "moderate[ly] improved" and that his back pain and spasms had decreased, on June 17, 2008, Plaintiff rated his back pain as a seven (7) out of ten (10) at an appointment with Dr. Lee. (R. at 270, 408, 410). That day, Dr. Lee opined that Plaintiff was "making slow progress" with the "current conservative management of physical therapy/nerve block/injection therapy." (R. at

408). However, when Plaintiff saw Dr. Cappellini on June 19, 2008, he reported "mild low back pain" with "no radiation to the extremities." (R. at 269).

On July 29, 2008, Plaintiff saw Dr. Lee and again described his pain level as a seven (7) out of ten (10). (R. at 401). At an appointment on August 7, 2008, Dr. Cappellini reported that Plaintiff was "not improved" and Plaintiff's "residual impairment is likely permanent." (R. at 268). Dr. Cappellini rated Plaintiff's prognosis as "poor" with respect to his "functional restoration" as well as his "future care." (*Id*.). On October 9, 2008, Dr. Cappellini again reported that Plaintiff's condition had not improved. (R at 266).

On December 4, 2008, Dr. Cappellini reported that Plaintiff was experiencing "increased spasm," but that Plaintiff had "reported feeling better." (R. at 264). However, on January 20, 2009, Dr. Cappellini wrote that Plaintiff had experienced increased pain with "progressive worsening in intensity over the past 1-2 weeks," which onset he found to be "insidious." (R. at 455). Thus, Dr. Cappellini wrote that Plaintiff's disability status was "present and continuing," his restrictions should "remain in effect," and his prognosis was "fair" for "conservative pain control modulation," but "poor" for "functional restoration." (*Id*.). On April 2, 2009, Dr. Cappellini wrote that Plaintiff had increased pain, and rated Plaintiff's prognosis the same that he had on January 20. (R. at 453). When Plaintiff saw Dr. Lee on April 21, 2009, he complained of a severe spasm; however, Dr. Lee felt that Plaintiff was "making progress" with his "conservative management" of symptoms. (R. at 389).

### 10. *Evaluation by Dr. Michael J. Seel, M.D. – May 2009*

On May 5, 2009, Plaintiff underwent an independent medical examination with an orthopedic surgeon, Dr. Michael J. Seel, M.D. (R. at 308). After examining Plaintiff, Dr. Seel

found that Plaintiff's gait was "slow and shuffling, but nonantalgic,[14]" that Plaintiff was "able to rise on his toes and heels and get on and off the examination table without difficulty," and that Plaintiff "was able to flex the lumbar spine 80 degrees sitting with legs extended." (R. at 312-13).

Dr. Seel noted "mild degenerative changes" to Plaintiff's spine, noting that Plaintiff's subjective decreased range of motion of the lumbar spine was "inconsistent between the standing position and the seated position with legs extended." (R. at 314). Further, Dr. Seel found that there "were no abnormal objective findings on physical examination." (*Id.*). Plaintiff's discogram from September 19, 2008 "showed discordant pain only" which Dr. Seel concluded "effectively ruled out" degenerative disc disease as the source of Plaintiff's ongoing pain. (R. at 314-15). Dr. Seel determined that Plaintiff was capable of returning to his job as a material handler performing heavy lifting, and signed an affidavit of recovery that day. (R. at 315, 317).

### 11. *Treatment by Dr. Cappellini and Dr. Lee – June-January 2010*

Plaintiff saw Dr. Cappellini on June 4, 2009, at which time Dr. Cappellini reported that his disability status continued. (R. at 449). After Plaintiff's appointment on June 10, 2009, Dr. Cappellini inserted an addendum that he had consulted with "Dr. Emmons" by phone "regarding the reasonableness and necessity of treatment as it relates to the work injury of [Plaintiff]." (*Id.*).

In his June 29, 2009 statement regarding Plaintiff's workers' compensation claim, Dr. Cappellini acknowledged that he "agree[d]" with the objective findings from Dr. Seel's examination of Plaintiff; however, Dr. Cappellini felt that Plaintiff's diagnosis was "complicated by underlying degenerative changes and compensatory mechanism" and that the reason Plaintiff's "clinical presentation does vary from time to time" is because of "periods of remission

---

[14]     "Antalgic" is a synonym for "analgesic" or "analgetic," which are adjectives that can be used to describe something that is "[c]haracterized by reduced response to painful stimuli." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

and insidious exacerbation with regards to flare ups in [Plainitff's] overall expressive symptom complex." (R. at 445). In Dr. Cappellini's opinion, Plaintiff had been "direct and forthright in his complaints and consistent in his clinical presentation." (*Id*). Dr. Cappellini concluded that Plaintiff was "limited to the sedentary to light duty realm" and that his prognosis was "poor" for complete functional restoration and "fair" for conservative pain control modulation. (R. at 446).

At appointments on July 16, August 27, and September 3, 2009, Dr. Cappellini reported that Plaintiff's disability status was "present and continuing," restrictions remained in effect, and the prognosis was the same as reported in the June letter. (R. at 435, 436, 444). At Plaintiff's appointment with Dr. Cappellini on September 17, 2009, Plaintiff complained of increased low back pain "with difficulty arising from a prone and supine recumbent position," but reported "feeling better" after his treatment that day. (R. at 434). On September 24, 2009, Dr. Cappellini inserted an addendum to his treatment notes from Plaintiff's September 17 appointment, reporting that he had spoken with "Dr. Bickel" from New Jersey for a utilization review consultation regarding the "reasonableness and necessity" of Plaintiff's "ongoing care from July of 2009." (*Id*.). Dr. Cappellini wrote that "[c]onservative management care on a supportive level was agreed to be… reasonably necessary and appropriate for the patient's condition." (*Id*.).

On October 22, 2009, Plaintiff presented to Dr. Cappellini with increased back pain, "discoloration about the portal plate with mild swelling," and "mild paravertebral hypertonicity[15] and slight left antalgia," although he "reported feeling better" after his treatment that day. (R. at 480). On November 5, 2009, Plaintiff reported increased back pain again, but after his treatment that day, his range of motion had "mild[ly] improved." (R. at 481). Nevertheless, Dr. Cappellini maintained that Plaintiff was "to remain at reduced activity." (*Id*.). Again, on November 19,

---

[15] "Hypertonicity" is a synonym for "hypertonia," which is "[e]xtreme tension of the muscles or arteries." STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006). "Paravertebral" is a term used to refer to something "[a]djacent to the vertebra or the vertebral column." *Id*.

2009, Plaintiff reported progressively worsening back pain; Dr. Cappellini examined Plaintiff and determined that he had incomplete ranges of motion and spasm, and that his disability status was still present and continuing. (R. at 482).

However, on December 3, 2009, despite Plaintiff's complaints of increased pain, Dr. Cappellini reported that Plaintiff was "improved and feeling better," his spasm had decreased, and his antalgia was "moderately improved," though Plaintiff's disability status was "present and continuing." (R. at 483).

On December 15, 2009, Dr. Lee reported that Plaintiff was "making fair progress with current conservative management." (R. at 571). At his January 21, 2010 appointment with Dr. Cappellini, Plaintiff was experiencing increased low back pain and stiffness, as well as difficulty walking and weight bearing after Dr. Lee had administered injections at his appointment the week before. (R. at 484). Dr. Cappellini opined that Plaintiff's disability status was present and continuing, and it remained unchanged into 2010. (R. at 484-92).

### C. Functional Capacity

On November 10, 2008, Dr. Lee completed a medical source statement for the Bureau of Disability regarding Plaintiff's limitations. (R. at 263). Dr. Lee reported that Plaintiff was capable of lifting and carrying two (2) to three (3) pounds frequently, but only ten (10) pounds occasionally. (R. at 262). In his opinion, Plaintiff could stand and walk somewhere between two (2) to six (6) hours in an eight-hour workday and could sit for less than six (6) hours in a workday. (*Id*.).

On December 22, 2009, Dr. Judith Homison performed a residual functional capacity assessment of Plaintiff in conjunction with his DIB claim. (R. at 458). She found that Plaintiff was capable of lifting and carrying ten (10) pounds frequently and twenty (20) pounds

occasionally, and that Plaintiff could stand, walk, and sit for about six (6) ours in an eight-hour workday. (R. at 459). Although Dr. Homison reported that Plaintiff had some postural limitations with respect to climbing, balancing, stooping, kneeling, crouching, and crawling, Plaintiff was otherwise unlimited in his residual functional capacity. (R. at 460-61). She determined that Plaintiff was not significantly limited in his daily activities because he was able "to care for young children in the home, prepare family meals, iron clothes and grocery shop," which "contradicts [Plaintiff's] other statement that he cannot stand for very long." (R. at 463). Additionally, Plaintiff's prescribed medications were "relatively effective in controlling his symptoms." (*Id*.). Dr. Homison concluded that, based on the evidence, Plaintiff's statements were "partially credible." (R. at 464).

On January 25, 2010, Dr. Lee performed a functional capacity assessment of Plaintiff at his office. (R. at 574). The results of a Spinal Function Sort test calculating Plaintiff's physical demand characteristic ("PDC") showed that he retained the ability to perform light to medium work. (R. at 575). Thereafter, Dr. Lee referred Plaintiff for a functional capacity evaluation at Keystone Rehabilitation Systems in Lemont Furnace, PA, which was conducted on January 28, 2010 by Kathy Higgins, MPT. (R. at 577). After evaluating Plaintiff, Ms. Higgins reported that he preferred to sit, but needed "to reposition or stand up after 30 minutes." (*Id*.). Ms. Higgins wrote that Plaintiff's "vocational goal is questionable," and that he "knows he is unable to return to [his] prior position [as a material handler] and is unsure if he could handle a more sedentary job." (*Id*.). Upon examination, Ms. Higgins found that Plaintiff had normal curvature of his spine. (R. at 578).

In a statement dated January 28, 2010, Dr. Lee opined that Plaintiff was capable of sitting, standing, walking, and driving a car up to 60 minutes at once. (R. at 551). He stated that

Plaintiff had a "moderate degree of muscle spasms along his mid and low back" and "walked slowly with back guarding." (R. at 552). He referenced Plaintiff's functional capacity evaluation and Spinal Function Sort test, in which Plaintiff "demonstrated the ability to perform sedentary work." (R. at 554). However, in his January 28, 2010 statement, Dr. Lee determined that Plaintiff "would qualify for possible light [to] medium work," and that Plaintiff could occasionally lift or carry up to a maximum of eighteen (18) to twenty (20) pounds, if he were "able to control his pain without taking any medication…" (R. at 567).

However, after reviewing Dr. Seel's May 2009 evaluation of Plaintiff, Dr. Lee "totally disagree[d] with Dr. Seel's disability evaluation and full recovery from work injury." (R. at 565). Dr. Lee added that although Dr. Seel believed that Plaintiff was capable of working in his previous job, which required heavy lifting, the spinal function sort test from January 2010 established that Plaintiff was only capable of light to medium duty work. (R. at 566). In Dr. Lee's professional opinion "and within a reasonable degree of medical certainty," Plaintiff's condition "was a direct result of a work related injury on [June 13, 2006] and [August 10, 2007], based upon detailed history[,] clinical examination and other various diagnostic tests." (R. at 567). Dr. Lee described Plaintiff's functional prognosis as "poor," since Plaintiff's back symptoms were "chronic and failed to respond with best conservative care lately." (*Id*.). He believed that Plaintiff's condition was "permanent and has shown no significant progress over the last 12 months." (*Id*.).

Dr. Lee concluded that Plaintiff had not yet recovered from his accident and was "totally disabled to [his] previous level of job as a material handler for Dick's Sporting Good[s] (heavy duty work)." (*Id*.). Finally, Dr. Lee added that "[a]ll diagnostic tests in order to fully evaluate

[Plaintiff's] symptoms… are medically absolutely necessary and reasonable" and that "the medical bill for this particular patient to be rendered is reasonably fair." (R. at 568).

On February 18, 2011, Dr. Cappellini completed a medical questionnaire regarding Plaintiff's functional capacity, reporting that Plaintiff was capable of sitting for, at most, three (3) hours out of an eight (8)-hour workday and standing or walking for (1) hour out of eight (8). (R. at 546). Dr. Cappellini commented that Plaintiff relied on a back brace when standing or walking because of pain and spasms caused by weight bearing activities. (*Id.*). In his opinion, Plaintiff could not engage in postural movements. (R. at 547). Further, he stated that Plaintiff was capable of lifting no more than ten (10) pounds occasionally. (*Id.*). Dr. Cappellini added that if Plaintiff were to return to work, he would require complete freedom to rest frequently throughout the day, and that it was necessary for Plaintiff to recline for a substantial period of time during the day. (R. at 548).

### D. Administrative Hearing

A hearing regarding Plaintiff's application for DIB on March 29, 2011 in Morgantown, West Virginia before ALJ Richard E. Guida. (R. at 28-69). Plaintiff appeared, accompanied by his wife and his attorney, Gregory Kunkel, Esquire. (*Id.*). Larry G. Kontosh, an impartial vocational expert, also testified.[16] (*Id.*)

Plaintiff testified that his most recent job was as a material handler at the distribution center of Dick's Sporting Goods, where he worked from 2005 until 2007. (R. at 36). In this capacity, Plaintiff performed tasks such as loading pallets for shipments to stores and driving forklifts. (*Id.*). Prior to this, he worked from approximately 2004-2005 as an assistant manager for Unity Tours, a travel agency in Philadelphia, Pennsylvania. (R. at 36-37). Additionally, he

---

[16]     Dr. Larry G. Kontosh, Ph.D. is a licensed clinical counselor with many years of experience working as a vocational expert. (R. at 112-121).

has "worked a lot of temporary job services," including as a customer service representative at a call center and as a cell phone and pager programmer. (R. at 37-39).

It was at Plaintiff's job as a material handler that he injured his back. (R. at 42). Plaintiff testified that while working an overtime shift, he heard a "pop" in his back, but paid it "no mind" until he got into bed that night and "couldn't move." (R. at 51). Although he got ready for work the next morning, his wife, noticing that he was "leaning to one side," drove him to the emergency room at Uniontown Hospital, where he was diagnosed with a lower back sprain. (*Id.*). Plaintiff testified that he obtained workers' compensation through his job for six weeks, until he was required to return to work. (R. at 51-52). However, soon after his return, he acquired an infection in his left eye for which he needed to wear an eye patch; therefore, he was unable to perform work as a material handler and was moved to the position of "sorter," which required him to separate boxes that had been unloaded from trucks. (R. at 52). Plaintiff testified that he injured his back for the second time when working as a sorter after he lifted a box and, upon attempting to move it, "heard another pop" in his lower back. (*Id.*). He stated that he spoke with his employer regarding the injury and inquired as to whether there were any light duty positions available; however, he was told there were no such positions and was "basically sent… home." (*Id.*). He admitted he had not worked anywhere since that time. (R. at 53).

The ALJ inquired as to how Plaintiff was affected by his back, to which Plaintiff responded that he had "chronic pain," "a lot of stiffness," and "a lot of swelling." (R. at 42). Further, Plaintiff testified that his left leg "gets cold sometimes" from his thigh down to his feet, that sometimes his left foot becomes numb, that he "can't sit for long periods of time" and that he "can't walk for long periods of time." (*Id.*). Plaintiff asserted that he is the primary caregiver of his six-year-old son, but that his sixteen-year-old stepson and wife do most of the household

chores, such as laundry and cleaning, and that the family pays someone to cut the front lawn. (R. at 46-47). He reported that he is able to stand for approximately 15 to 30 minutes before needing to sit down, and that he can sit for 15 to 30 minutes before needing to stand. (R at 56-57). He believed that he could lift 10 to 20 pounds at once. (R. at 57).

When asked to describe a "typical day," Plaintiff testified that he normally awakens around 7:30 a.m. to dress his six-year-old son for school before accompanying him, as well as a six-year-old niece who is dropped off in the mornings, to the bus stop. (R. at 43, 46). Plaintiff stated that at this point, he normally takes a shower, performs home exercises prescribed by Dr. Lee, then stretches and applies cream to his back before dressing. (R. at 43-44). Occasionally, he takes a nap for about fifteen minutes after returning from the bus stop. (R. at 54). Plaintiff reported that he spends most of the day on the computer doing "research on music" in contemplation of starting an independent record business and "looking at houses," since he and his wife were considering relocating to Philadelphia. (R. at 44). He explained that he keeps his feet propped up on his computer chair for the majority of the day because he experiences tingling in his legs. (R. at 55). At the conclusion of his computer research, Plaintiff typically watches television, listens to music, and reads until around 3:15 p.m., when he needs to retrieve his son from the bus stop. (*Id*.). After picking up his son, Plaintiff begins to prepare dinner. (*Id*.). Plaintiff admitted that he cooks meals such as sautéed turkey wings, rice, and vegetables, enough for a family of four. (R. at 45). Despite testifying that his medication causes him to sometimes fall asleep when sitting, Plaintiff stated, "Once I'm up, I'm normally up." (R. at 54). He reported that he typically goes to bed around 2 a.m. each night. (*Id*.).

The ALJ commenced his examination of the vocational expert by asking him to classify Plaintiff's past work. (R. at 60). Dr. Kontosh testified that Plaintiff's work as a material handler

is considered heavy work; the job at the travel agency as well as the mortgage clerk position are both classified as sedentary; and the customer service clerk position is light. (R. at 61). Although he could not find a classification for the pager programmer job, Dr. Kontosh suggested that it would be considered sedentary work. (*Id.*).

Next, the ALJ asked the vocational expert a number of hypothetical questions. First, Dr. Kontosh was asked to assume an individual of Plaintiff's age, education, and work experience able to perform work at the light exertional level and only occasional postural movements, except that this person must never climb ladders, ropes, or scaffolds. (R. at 61-62). With respect to Plaintiff's past relevant work, Dr. Kontosh replied that all of the positions except that of the material handler met the conditions of the hypothetical. (R. at 62). As for other jobs available in significant numbers in the national and regional economy, Dr. Kontosh testified that such a person could work as a cashier/checker, a sales clerk, and a fast food worker, all of which were light duty jobs. (*Id.*).

For his next hypothetical, the ALJ asked the vocational expert to assume the same individual, but to include an additional limitation that this person is limited to "simple, routine, and repetitive task[s] performed in a work environment free of fast-paced production requirements involving only simple, work-related decisions, and with few, if any, workplace changes" and "[o]nly occasional interaction with supervisors, coworkers, and the public." (R. at 63). Here, Dr. Kontosh testified that such a person could not perform Plaintiff's past work or the jobs from the previous hypothetical because of the limitation on interaction with the public. (R. at 63-64). However, he reported that there were other jobs available in the national and regional economy at the light duty level, suggesting representative jobs of a housecleaner, garment folder, and garment hand washer. (R. at 64).

For his third question, the ALJ asked Dr. Kontosh to assume "a person limited to a sedentary exertional level, sit/stand option, occasional postural movements, except never climb ladders, ropes, [or] scaffolds" and whether such a person could perform Plaintiff's past work. (R. at 64). The vocational expert stated that all of the sedentary work in the work history meets the condition, "so long as the aggregate standing time doesn't exceed one third of the workday." (R. at 65). As for jobs in the national and regional economy, Dr. Kontosh testified that such a person could work as a receptionist and telephone solicitor, both at the sedentary level, and as a call out operator. (*Id.*). Building on his last question, the ALJ asked a fourth hypothetical, assuming all of the limitations of the third, in addition to "unskilled work, that is limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions, and with few, if any, workplace changes" and "[o]nly occasional interaction with supervisors, coworkers, and the public." (R. at 65-66). The vocational expert answered that such a person could not perform any of Plaintiff's past relevant work and that none of the jobs listed in the previous hypothetical could be performed because of the restrictions on public contact, except for the call out operator; he also suggested a small parts assembler job, which is sedentary. (R. at 66). Further, Dr. Kontosh testified that an employer would customarily tolerate one or two instances of tardiness or absence over the course of employment. (*Id.*). He reported that these jobs typically provide a break of 10 to 15 minutes in the morning and afternoon, as well as 30 to 60 minutes for lunch. (R. at 67). An employee could only be off task up to and including 10 percent of the time. (*Id.*).

Finally, the ALJ asked a fifth question in which the vocational expert was to assume a person with all of the limitations of the previous four hypotheticals, including "an additional limitation of exceeding tolerances for being off-task, and/or absences." (R. at 67). Dr. Kontosh

testified that in this hypothetical situation, there were no jobs that such a person could perform. (*Id.*). On cross-examination, Plaintiff's attorney gave Dr. Kontosh a copy of Dr. Cappellini's medical source statement to review, then asked him to assume the limitations of the first four hypothetical questions, in addition to those reported by Dr. Cappellini, and whether such a person could perform any work. (R. at 67-68). Because Dr. Cappellini had reported Plaintiff had an exertional capacity for five hours of work, Dr. Kontosh replied that full-time employment would not be possible under this condition. (R. at 68).

## IV.  STANDARD OF REVIEW

To be eligible for disability insurance benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of at least twelve months, or which can be expected to result in death. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). To determine whether a claimant has met the requirements for disability, the Commissioner must utilize a five-step sequential analysis in reviewing the claim. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1; (4) whether the claimant's impairments prevent him or her from performing past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a) (4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is

determined to be unable to resume past relevant work, the burden shifts to the Commissioner at Step Five to prove that, given the claimant's mental or physical limitations, age, education, and work experience, he is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[17], 1383(c)(3)[18]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a *de novo* review, nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Mussi v. Astrue*, 744 F.Supp.2d 390 (W.D. Pa. 2010); *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C.*

[17]    Section 405(g) provides in pertinent part: "Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action… brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business." 42 U.S.C. § 405(g).
[18]    Section 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

*v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion… so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88 (2007).

## V.    DISCUSSION

In his April 27, 2011 decision, the ALJ concluded that Plaintiff was not disabled from the time of August 10, 2007, Plaintiff's alleged onset date, through June 30, 2009, the date Plaintiff last met the insured status requirements of the Act. (R. at 15).

Plaintiff satisfied Step One of the determination because he had not worked from August 10, 2007 through June 30, 2009 (20 C.F.R. § 404.1571, *et seq.*). (R. at 17). At Step Two, the ALJ found that Plaintiff's degenerative disc disease of the lumbar spine and diabetes mellitus were medically determinable severe impairments, but that Plaintiff's depression was non-severe because it did not cause more than minimal limitations in his ability to perform basic mental work activities (20 C.F.R. § 404.1520(c)). (*Id.*). At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that medically equaled or exceeded one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. at 18).

Subsequently, the ALJ concluded that Plaintiff retained the residual functional capacity for light work as defined in 20 C.F.R. § 416.967(b), except that Plaintiff "could not climb ladders, ropes, or scaffolds and could only perform other postural movements occasionally." (R.

at 19). After considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," in accordance with 20 C.F.R. § 404.1529, SSR 96-04p, and SSR 96-07p, as well as opinion evidence under 20 C.F.R. § 404.1527 and SSRs 96-02p, 96-05p, 96-06p, and 06-03p, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff was not fully credible with respect to the intensity, persistence, and limiting effects of these symptoms. (*Id*.). The ALJ's residual functional capacity assessment was supported by the objective studies, Plaintiff's activities of daily living, and the opinions of Dr. Kramer and Dr. Seel. (R. at 22). Whereas the opinions of Dr. Lee and Dr. Cappellini were inconsistent and based largely on Plaintiff's subjective complaints, entitling them to little weight, the ALJ credited the "reasoned assessments" of Dr. Kramer and Dr. Seel with substantial weight because their findings were consistent with the objective evidence, which "fail to demonstrate a condition of the degree of severity" claimed by Plaintiff, particularly in light of the fact that Plaintiff engaged in "significant daily activities." (R. at 20-22). Therefore, the ALJ determined that Plaintiff was capable of performing light work activities, subject to the postural limitations indicated. (R. at 22). Finally, because the vocational expert testified that a person with Plaintiff's limitations would be able to perform his past relevant work as a customer service clerk, the ALJ concluded that Plaintiff was capable of working in this position, which would not require him to engage in the work-related activities precluded by the residual functional capacity assessment. (R. at 23).

Plaintiff presents two arguments in support of his Motion for Summary Judgment. (Docket No. 9). First, Plaintiff claims that the ALJ "erred in failing to accord controlling weight to the opinions of [Plaintiff's] treating physician and chiropractor." (*Id*. at 10). Coupled with this

allegation is Plaintiff's second contention that "[t]he ALJ's credibility determinations are not supported by substantial evidence" because the ALJ "accorded little weight to the opinions of Dr. Lee, a treating physician" and "likewise erred in minimizing [Plaintiff's] complaints of pain based on the fact that he cares for his young son and is able to cook meals." (*Id.* at 13-14).

Defendant responds that "[t]he ALJ correctly evaluated the opinions of Plaintiff's treating medical providers under the regulations" and "articulated legally sufficient reasons to support his evaluation of the medical opinion evidence." (Docket No. 12 at 12). Moreover, Defendant maintains that substantial evidence supports the ALJ's finding that "Plaintiff's subjective complaints were not totally credible." (*Id.* at 17).

Because the issues of weight and credibility are inextricably related, the Court will first address Plaintiff's arguments pertaining to the weight given to the medical opinions, then move to a discussion of the ALJ's credibility determination with respect to Plaintiff himself.

## A. Medical Opinion Evidence

According to Plaintiff, "it is clear that the ALJ failed to properly evaluate the opinions of Dr. Cappellini and Dr. Lee," Plaintiff's treating medical providers. (Docket No. 9 at 10). However, the Court finds that substantial evidence adequately supports the ALJ's decision to assign "little weight" to these opinions for the following reasons. (*See* R. at 22).

As a threshold matter, only the opinions of "acceptable medical sources" are entitled to controlling weight under the regulations. 20 C.F.R. §§ 404.1527(d) and 404.927(d). The regulations make plain the distinction between "acceptable medical sources" and "other sources" whose opinions cannot establish the existence of a medically determinable impairment. *See* 20 C.F.R. §§ 404,1513, 416.913; SSR 06-03p.[19] In contrast to licensed physicians, chiropractors are

---

[19]    Though Plaintiff claims that the ALJ "failed to even acknowledge SSR 06-03p in his decision" (Docket No. 9 at 13), the ALJ clearly articulates that he "considered opinion evidence in accordance with the requirements of…

not "acceptable medical sources." *Id.*; *Hartranft v. Apfel*, 181 F.3d 358, 361 (3d Cir. 1999). While "DIB eligibility cannot rest upon the opinion of a chiropractor," an ALJ "can *consider* a chiropractor's opinion, along with all of the other evidence that a claimant may present insofar as it is deemed relevant to assessing a claimant's disability." *Hartranft*, 181 F.3d at 361-62 (emphasis not added). Therefore, it is instantly clear that Dr. Cappellini's opinion was not entitled to controlling weight, though the ALJ may have used it as additional evidence in evaluating the limitations caused by Plaintiff's impairment. *See* SSR 06-03p at *2 (only "acceptable medical sources" can establish the existence of a medically determinable impairment; "[h]owever, information from 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment and how it affects the individual's ability to function.").

Despite acknowledging that Dr. Cappellini is not an acceptable medical source, Plaintiff attempts to assert that his opinion was entitled to substantial weight. (Docket No. 9 at 12). However, Plaintiff's allegations in this vein, including that the ALJ engaged in a "wholesale rejection" of and "summarily dismiss[ed]" Dr. Cappellini's opinion "without merit," are, as arguments themselves, without merit. (*See id.*). On the contrary, the ALJ concluded that although Dr. Cappellini is "not an acceptable medical source" whose opinion "is naturally less persuasive than the assessments of orthopedic specialists such as Dr. Kramer and Dr. Se[e]l," Plaintiff's "numerous" visits to Dr. Cappellini for chiropractic treatment were "appropriate" and factors that weighed "favorably" on Plaintiff's credibility. (R. at 20, 22). Further, the ALJ's decision does not "ignore" Dr. Cappellini's opinion, "improperly" or otherwise. (*See* Docket No. 9 at 13).

SSRs [including] 06-[0]3p." (R. at 19). Further, Plaintiff's observation regarding the ALJ's reference to Dr. Cappellini as "Mr. Cappellini" fails to inform the Court's analysis since the ALJ appropriately considered Dr. Cappellini's opinion and substantial evidence supports his determination.

Instead, the ALJ engages in a detailed analysis of why he chose to discredit Dr. Cappellini, as discussed. (R. at 22).

In support of his proffered argument that it was error to not credit the opinions of Dr. Cappellini and Dr. Lee with "controlling weight," Plaintiff relies on a so-called "well-settled" principle of disability determinations "that the ALJ is required to afford the opinions of treating physicians with great weight..." (Docket No. 9 at 11 (ostensibly citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000))). Initially, Dr. Cappellini is not a physician. As stated, he is a non-acceptable medical source. *See* 20 C.F.R. §§ 404.1513, 404.1527(d), 404.927(d), and 416.913; SSR 06-03p. As to Dr. Lee, who *is* considered a treating physician under the regulations, Plaintiff blunders in his attempt to frame the weight analysis pronounced by *Morales* as a *requirement*, much less a "well-settled" one.

Instead, *Morales* echoes "[a] cardinal principle," which is "that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Becker v. Comm'r of Soc. Sec. Admin.*, 403 F.App'x 679, 686 (3d Cir. 2010) (quoting *Morales*, 225 F.3d at 317). The language employed by the Court of Appeals in describing this "guiding" principle demonstrates that it is not absolute; indeed, the Court elucidates that where medical opinions conflict, "the ALJ may choose whom to credit." *Becker* at 686 (quoting *Morales,* 225 F.3d at 317). Although an ALJ "cannot reject evidence for no reason or for the wrong reason," *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999), when presented with conflicting medical opinions "the ALJ is not only entitled but required to choose between them," *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Further, pursuant to the regulations, controlling weight should only be placed on a treating physician's opinion when it is well supported and consistent with the other

medical evidence in the record. 20 C.F.R. § 416.927(d)(2); *see Johnson v. Comm'r of Soc. Sec.*, 398 F.App'x 727, 735 (3d Cir. 2010). "Otherwise, the opinion should be given weight proportional to the medical evidence presented by the treating physician to support the opinion." *Johnson* at 735-36 (ALJ did not err in affording "no probative weight" to treating physician's opinion where it was not supported by medical findings and was inconsistent with recent objective evidence).

Here, the ALJ was faced with conflicting evidence regarding Plaintiff's back impairment and the limitations stemming therefrom. Specifically, neither the objective evidence nor any of the examining physicians' opinions comported with the findings of Dr. Lee and Dr. Cappellini or Plaintiff's subjective complaints regarding pain. (R. at 19-22). Accordingly, the ALJ properly proceeded to weigh the conflicting evidence. *See Johnson* at 735-736. The Court agrees with Defendant that the ALJ appropriately weighed the conflicting evidence, given that "[t]he record contained ample evidence that contradicted the disability opinions of Drs. Cappellini and Lee," (Docket No. 12 at 14), and found that the opinions of Dr. Kramer and Dr. Seel were persuasive and consistent with the medical evidence thus entitling them to substantial weight.

Although the ALJ determined that Plaintiff was not limited to the debilitating extent opined by Dr. Lee and Dr. Cappellini and noted that the examining physicians reported that Plaintiff was capable of performing work that required heavy lifting, the ALJ concluded that the weight of the evidence supported Plaintiff's residual functional capacity for light duty work. (R. at 21). Given same, the ALJ's determination was not "based solely on his own amorphous impressions." *Morales*, 225 F.3d at 318 (citing *Kent v. Schweiker*, 710 F.2d 110, 115 (3d Cir. 1983)). The ALJ did not simply "rubber stamp" the findings of the examining physicians when

discrediting Plaintiff's treating medical sources; he gave Plaintiff "the utmost benefit of the doubt" in concluding that Plaintiff was limited by *some* work-related restrictions. (R. at 21).

Plaintiff disputes the ALJ's credibility determination as to Dr. Lee's opinions, claiming that the ALJ found there to be an "inherent conflict of interest" in light of Plaintiff's pending workers' compensation claim. (Docket No. 9 at 13 (citing R. at 21)). However, Plaintiff misstates the findings of the ALJ in arguing that "[w]hile the ALJ… freely questions the veracity and integrity of [Plaintiff's] treating physicians because they offered opinions in the context of a workers' compensation proceeding, the ALJ blindly accepted the opinions of Dr. Kramer and Dr. Seel who were paid by the workers' compensation insurance carrier to provide opinions concerning [Plaintiff's] work injuries and his functional limitations." (*Id.*).

The ALJ wrote that he "recognizes the inherent conflict of interest in Dr. Lee's assessment that [Plaintiff] is not totally recovered from his work-related injury" and references Dr. Lee's statement "that the medical bill for [Plaintiff] is reasonable," which the ALJ felt suggested "that [Dr. Lee] was attempting to justify his charges for services rendered to [Plaintiff]." (R. at 22). The implication of this comment is that Dr. Lee was financially interested in Plaintiff's treatment, not that there was a "conflict of interest" because his opinions were submitted in a workers' compensation context. Nowhere in his decision does the ALJ refute the opinions of Dr. Lee and Dr. Cappellini on the basis that they were provided in relation to Plaintiff's workers' compensation claim. Rather, he found that they were entitled to less weight than those of Dr. Kramer and Dr. Seel because they were not supported by objective studies, they were inconsistent, and they overstated functional limitations claimed by Plaintiff himself. (R. at 21-22).

However, as a contextual backdrop to the ALJ's analysis, it should be noted that the opinions regarding Plaintiff's functional capacity were provided in conjunction with his claim for workers' compensation. Critically, the Court of Appeals for the Third Circuit has acknowledged the differences between the statutory tests for Social Security disability as opposed to those for purposes of workers' compensation. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984). In *Coria*, the Court distinguished "between those portions of the physicians' reports that represent the physician[s]' medical findings and those portions of the reports that represent conclusions as to the claimant's disability for purposes of workers' compensation"; where the evidence contains both:

> the ALJ should evaluate the objective medical findings set forth in the medical reports for submission with the workers' compensation claim by the same standards that s/he uses to evaluate medical findings in reports made in the first instance for the Social Security claim, unless there is some reasonable basis to believe a particular report or finding is not entitled to comparable weight.

*Coria*, 750 F.2d at 247-48.

Here, the ALJ drew his findings from the record regarding Plaintiff's functional limitations according to the Act, which directs a different disability analysis than that of workers' compensation claims. (*See* R. at 19 (outlining the ALJ's analysis under the regulations)). Given that disability under the Act is defined as that which prevents a claimant from engaging in any substantial gainful activity, 42 U.S.C. § 423(d)(1)(A), but disability for purposes of workers' compensation is determined using a set of criteria that may permit an award even if a claimant can perform some gainful activity, it was reasonable for the ALJ to compare the weight of the opinions in light of the fact that they were rendered with respect to Plaintiff's ability to perform his job as a material handler. *See Coria*, 750 F.2d at 247-248; *see also Hartranft*, 181 F.3d at 362 (where the Court upheld an ALJ's decision that a plaintiff could perform light work, in part,

because "the ALJ recognized the limited significance" of a physician's opinion made in connection with the plaintiff's workers' compensation claim, not his DIB claim).

In effect, the ALJ agreed with Dr. Lee and Dr. Cappellini's findings regarding Plaintiff's functional limitations to the extent that they prevented him from engaging in his job as a material handler, which requires heavy lifting. (R. at 22-23). However, he found that Plaintiff had other past relevant work as a customer service clerk that was not precluded by Plaintiff's residual functional capacity for light work. (R. at 23). Not only is the record replete with evidence to support Plaintiff's capacity for light work, the opinions of Dr. Lee and Dr. Cappellini that Plaintiff can perform light to medium work are reconcilable with the ALJ's residual functional capacity assessment. (R. at 22). Additionally, Dr. Lee frequently commented throughout his notes that the treatment rendered to manage Plaintiff's pain was "conservative" and that Plaintiff was helped by it. (*See e.g.* R. at 382, 385, 389, 397, 401, 478, 572).

Therefore, the Court finds that the ALJ's decision to assign "little weight" to the opinions of Plaintiff's treating medical providers and "substantial weight" to those of his examining physicians is adequately supported by substantial evidence.

### B. Assessment of Plaintiff's Credibility

According to Plaintiff, the ALJ "erred in minimizing [Plaintiff's] complaints of pain" based on the fact that Plaintiff cares for his young son, cooks meals, and uses the Internet, which Plaintiff asserts "hardly provides substantial evidence to support the ALJ's determination that he is capable of working full time in competitive employment." (Docket No. 9 at 14). However, the Court agrees with Defendant that the ALJ's determination as to Plaintiff's credibility is indeed supported by substantial evidence. (Docket No. 12 at 15-17).

An ALJ must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when the claimant's testimony is supported by competent evidence. *Shaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999) (citing *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979)); *see Wright v. Comm'r of Soc. Sec.*, 386 F.App'x 105, 109 (3d Cir. 2010). This requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. *See* 20 C.F.R. 20 § 404.1529(c). If an ALJ concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in the ALJ's decision. *Cotter*, 642 F.2d at 705. That standard is met here because the ALJ considered Plaintiff's subjective complaints and determined that they were not supported by competent evidence. In sum, Plaintiff reported experiencing pain that was not supported by objective evidence, his description of daily activities was irreconcilable with pain as debilitating as he alleged, and, moreover, Plaintiff's vocational goals were reasonably questioned by the ALJ in assessing the severity of his symptoms. (R. at 20-21).

Plaintiff's claim that his ability to engage in childcare is not indicative of his ability to perform substantial gainful activity is predicated on three cases that are not binding on this Court. (Docket No. 9 at 14 (citing *Gentle v. Banhart*, 430 F.3d 865, 866-68 (7th Cir. 2005); *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2005); *Tang v. Apfel*, 205 F.3d 1084, 1087 (8th Cir. 2000)). Plaintiff argues that this Court should apply the holding in *Gentle*, a case from the Seventh Circuit, based on the notion that "taking care of an infant, although demanding, has a degree of flexibility that work in the workplace does not…" (*Id*. (quoting *Gentle*, 430 F.3d at 867)). However, Plaintiff's son is a six-year-old boy, not an infant.[20] Whether Plaintiff means to suggest that caring for a six-year-old is more or less demanding than caring for an infant is

---

[20]    Further, Plaintiff's son attends school every day.

unclear, but the Court will not speculate. Instead, we decline to follow *Gentle* in favor of a decision by our Court of Appeals distinguishing *Gentle* from a strikingly similar set of facts to those at bar. *See Smith v. Astrue*, 359 F. App'x. 313 (3d Cir. 2009). In *Smith*, the Court rejected an identical argument made by Plaintiff's same counsel relying on *Gentle*, and we will also reject Plaintiff's argument for the following reasons.

In *Smith*, the Court of Appeals for the Third Circuit faced the same issue of credibility where a claimant alleged disabling pain, yet performed domestic activities full-time, including childcare. There, the plaintiff claimed that: (1) she could only sit, stand, and walk for one hour each day; (2) she was limited to no postural movements; (3) she required complete freedom to rest frequently throughout the day; (4) she required a substantial period of time to lie down or sit on a recliner during the day; and (5) she suffered from conditions that were permanent in nature. *Smith*, 359 F.App'x. at 315. There, the plaintiff testified that she was the primary caregiver of her youngest child, despite claiming to be virtually bedridden due to back pain. *Id.* at 316. As is the case here, the Court found that the ALJ did not err in declining to afford the opinion of plaintiff's treating physician controlling weight, given that it was "contradicted by several pieces of evidence," contained "internal inconsistencies" and was largely based on "checklist forms" that constitute weak evidence in the context of a disability analysis. *Id.* (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

Additionally, the Court of Appeals concluded "in terms of [the plaintiff's] activities, the fact that she was able to act as the sole caregiver of her young child for at least two years… indicates a lesser level of pain than what is claimed." *Id.* at 317. There, the plaintiff (through same counsel) also argued that *Gentle* "flatly reject[s]… the argument that caring for an infant [i]s evidence of an ability to perform full time competitive work." *Id.* at n. 3; (*see* Docket No. 9

at 14). However, the Court in *Smith* found that *Gentle* was "easily distinguishable" because in *Gentle*, the claimant "cared for her child with the aid of her sister, a neighbor, and another woman," whereas in *Smith,* the plaintiff "was the sole caretaker for a period of at least two full years." *Smith*, 359 F.App'x. at 317, n. 3. Here, too, *Gentle* is distinguishable because Plaintiff not only testified that he is the primary caretaker of his young son, he also testified that he is capable of simultaneously caring for his young niece when she is dropped off each morning at his home. (*See* R. at 43, 46). Moreover, as in *Smith*, by the time he applied for DIB, Plaintiff had been the sole caretaker of his son, who was not yet of school age, for a number of years. (R. at 165, 247, 415).

With respect to Plaintiff's other daily activities, the ALJ points to Plaintiff's "admission" regarding the hours he spends on his computer each day, stating it "tends to belie [Plaintiff's] contention that he can only sit for 15 minutes at a time." (R. at 20). The ALJ also took into account the fact that Plaintiff has "failed to earn yearly income reflective of substantial gainful activity in 2002, 2003, 2004, and 2005," which he found "raises a question as to whether [Plaintiff's] continuing unemployment is actually due to medical impairments." (R. at 20). Both the residual functional capacity, as discussed, and the ALJ's inference regarding Plaintiff's work record support the ALJ's determination that Plaintiff's statements were not entirely credible. Nevertheless, he credited Plaintiff to the extent that he did not find him to be capable of heavy work, but did find that he was capable of performing light work subject to the medically determinable postural limitations. (R. at 22). The Court thus finds that the ALJ's determinations were reasonable, appropriate, and supported by substantial evidence with respect to Plaintiff's credibility.

## VI.    CONCLUSION

Based on the foregoing, the decision of the ALJ is adequately supported by substantial evidence from the record within the meaning of 42 U.S.C. § 405(g). Therefore, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED. Accordingly, the decision of the Commissioner is AFFIRMED. Appropriate Orders follow.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:      October 17, 2012

cc/ecf:    All counsel of record.